IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHRYSTAL MARLING,

             Plaintiff,

    vs.                                Civil Action 2:11-CV-522
                                         Judge Frost
                                         Magistrate Judge King

MICHAEL J. ASTRUE, Commissioner
of Social Security,

             Defendant.

## REPORT AND RECOMMENDATION

### I.
### Introduction and Background

      This is an action instituted under the provisions of 42 U.S.C. §405(g) for review of a final decision of the Commissioner of Social Security denying plaintiff's application for disability insurance benefits. This matter is now before the Court on plaintiff's *Statement of Errors*, Doc. No. 11, the Commissioner's *Memorandum in Opposition*, Doc. No. 14, and plaintiff's *Reply Memorandum*, Doc. No. 15.

      Plaintiff Chrystal Marling filed her application for benefits on August 19, 2008, alleging that she has been disabled since July 19, 2008, as a result of bi-polar disorder and schizophrenia. *PageID##* 192-94, 222. The application was denied initially and upon reconsideration, and plaintiff requested a *de novo* hearing before an administrative law judge.

      A hearing was held on June 9, 2010, at which plaintiff, represented by counsel, appeared and testified, as did Larry A. Bell, who testified as a vocational expert. In a decision dated June 24, 2010, the administrative law judge found that plaintiff suffers no severe physical impairments and that her severe mental impairments, which consist of bipolar disorder and schizophrenia, paranoid type with alleged hallucinations, do not preclude the performance by her of her prior work as a janitor. The administrative law judge therefore concluded that plaintiff is not disabled within the meaning of the Social Security Act. *PageID##* 95-112. That decision became the final decision of the

Commissioner of Social Security when the Appeals Council declined review on April 18, 2011. *PageID*## 84-87.

Plaintiff was 48 years of age at the time the administrative law judge issued his decision. She has a ninth grade, "limited" education and prior relevant work experience as an elder care sitter and janitor. *PageID*## 223, 227, 238.

Plaintiff testified at the administrative hearing that she last worked in July 2008 as a janitor. *PageID*# 125. She can no longer work because of anxiety and panic attacks, *PageID*## 126, 135-36, conditions that she first experienced when she was 17 years old and which have become increasingly severe. *PageID*# 127. Plaintiff also has short term memory problems and cannot concentrate. *PageID*# 128. Plaintiff acknowledged a history of alcohol and drug abuse but testified that she has abstained from both since 2002. *PageID*## 134-35.

Plaintiff testified that she sees "witches and warlocks" and, occasionally, spirits. *PageID*# 132. She is depressed; often, she does not want to get out of bed or do anything. *PageID*# 134. She frequently feels confused and lost. *Id.* Plaintiff received mental health care at North Point Consulting and Behavioral Health Services by Elizabeth McClure, a psychiatric nurse practitioner, for two years, and has undergone counseling by Cathy Campbell, M.Ed., a licensed counselor at Women's Tri-County, every two weeks since October 2009. *PageID*# 128-29. *See PageID*# 375. She sees a psychiatrist at North Point every three months. *PageID*# 128. At the time of the administrative hearing, she was taking Lamictal, Vistaril and Lithium, *PageID*# 129, which calmed her and presented no side effects. *PageID*# 130.

Plaintiff testified that she spends her time on a typical day smoking cigarettes, watching television and sleeping 10 hours per day. *Id.* Her husband and daughter do most of the household chores, although she does the dishes and laundry. *PageID*# 137. Depression and lack of energy prevent her from cleaning, dusting or vacuuming. *Id.* She occasionally reads the Bible but has difficulty understanding what she has read. *PageID*# 138.

**II.**

2

**The Medical Evidence of Record.**

**Mental Impairments**

**Belmont Community Hospital**

Plaintiff was hospitalized through emergency admission for a psychiatric evaluation at the Belmont Community Hospital in September 2002. *See PageID##* 393-404. At the time of admission, her Global Assessment of Functioning ["GAF"] was 20.[1] *PageID#* 400. She was discharged four days later with diagnoses of major depression with psychotic features and post traumatic stress disorder, r/o schizo-affective disorder. Her GAF upon discharge was 55. *PageID#* 401. She was prescribed medication and was directed to follow up with Tri-State Health Care, Inc. *PageID##* 402-03.

**Karen Campbell, M.A./Vic Cerra, Ed.D.**

Karen Campbell, M.A., a psychology assistant working under the supervision of psychologist Vic Cerra, Ed.D., performed a psychological evaluation of plaintiff on April 3, 2008, at the request of the county child welfare services agency. *PageID##* 280-91. Plaintiff was noted to be guarded and suspicious. *PageID#* 283. She reported a decreased need for sleep over the prior two weeks. Plaintiff reported a history of emotional, physical and sexual abuse and symptoms of anxiety, depression and paranoia. She had left school in the tenth grade after losing interest in school and becoming pregnant. Her grades were average to below average. *PageID#* 281. Plaintiff also reported an attempted suicide by overdose at the age of 13, and three prior psychiatric hospitalizations for "nervous breakdown," marital problems, and psychotic symptoms that included auditory and visual hallucinations and paranoia. At the time of the examination, plaintiff was not using anti-psychotic medications because she did not think that they worked. *Id.*

---

[1] "The [Global Assessment of Functioning] GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas." *Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 2012 WL 372986 (6th Cir. Feb. 7, 2012).

On clinical examination, plaintiff struggled to remain focused and was observed smiling and talking to herself. Her mood appeared to be depressed and her affect was congruent with her mood. *PageID#* 283. She was fully oriented; her speech was relevant and coherent. She exhibited normal psychomotor movement and maintained fair eye contact. Plaintiff's immediate, recent and remote memory processes were intact. She denied hallucinations, delusional thinking, obsessive or compulsive thoughts or behaviors, phobias and panic attacks. She did report that she worries about everything and complained of depression and anxiety. Although she reported past symptoms of mania, she denied recent episodes. *Id.*

On the WAIS-III, plaintiff achieved a verbal I.Q. score of 68, a performance I.Q. score of 74 and a full scale I.Q. score of 68. *PageID#* 284. On the WRAT-4, plaintiff read at the 4th and 5th grade level; math computation skills were at the 8th grade level. *PageID##* 285-88. The Beck Anxiety Inventory indicated that plaintiff was experiencing mild symptoms of anxiety, and the Beck Depression Inventory indicated that plaintiff was experiencing moderate depressive symptoms. *PageID#* 289.

In a report signed by both Ms. Campbell and Dr. Cerra, plaintiff was diagnosed with bipolar I disorder, most recent episode depressed, moderate; schizophrenia, paranoid type; alcohol dependence in full remission; and borderline intellectual functioning. Her GAF was 48. *PageID##* 289-90. Ms. Campbell recommended that plaintiff participate in individual counseling and be evaluated by a psychiatrist for medication. *PageID#* 290.

**North Point Consulting and Behavioral Health Services**

In June 2008, plaintiff presented to North Point Consulting and Behavioral Health Services ("North Point") for problems with her "nerves" and anxiety. *PageID##* 300-03. She reported low energy levels and inability to concentrate. She also reported a decreased need to sleep. Plaintiff's speech was rambling and pressured; she smiled inappropriately and was guarded and argumentative. Plaintiff's eye contact was average. Her demeanor was mistrustful, preoccupied and paranoid. Her thought processes were circumstantial, with flight of ideas, and she reported auditory and visual hallucinations. Her mood was irritable and her affect was labile. On clinical examination, plaintiff's attention and

4

concentration were moderately decreased and her intelligence was estimated to be in the borderline range. *PageID##* 301-02. Her diagnosis was the same as that of Dr. Cerra and Karen Campbell. She was assigned a GAF score of 48. *PageID#* 302. Abilify was prescribed. *PageID#* 303.

At her next visit, plaintiff reported improved sleep and lowered irritability, although she still had some anxiety. She denied hallucinations. It was noted that her speech was less rambling and pressured; she was less agitated and more trusting. *PageID##* 298-99.

When seen on July 22, 2008 by psychiatric nurse practitioner Elizabeth McClure, plaintiff reported that she had run out of Abilify and had not been doing well. Plaintiff's speech was spontaneous and mildly pressured; her eye contact was direct and almost staring in nature. Her affect varied and she was tearful at times. Ms. McClure changed plaintiff's medications. *PageID#* 296.

In September 2008, plaintiff reported to Ms. McClure that she felt overwhelmed and stressed by a family situation. Her current medication was not helping with her anxiety. Plaintiff's speech was spontaneous, her affect was flat, her eye contact was almost staring and her voice lacked inflection. She denied visual or auditory hallucinations. One of plaintiff's medications was increased. *PageID#* 346.

In October 2008, plaintiff reported continuing mood instability and irritability. Plaintiff's speech was spontaneous; she was more interactive during the interview with Ms. McClure and showed some mild variation in her affect. Her thoughts were generally goal-directed. Ms. McClure increased another medication. *PageID#* 343.

In November 2008, plaintiff continued to report problems with anxiety and family and financial concerns. Plaintiff's speech was spontaneous and she was more appropriate in her interactions. She was able to respond more readily and showed some variation in affect. She reported no side effects to her medications. *PageID#* 345.

In January 2009, plaintiff reported continuing agitation and discord at home; her anxiety was particularly problematic. Plaintiff's speech was spontaneous, her thoughts were relevant and goal-directed, her affect was restricted and her eye contact was good. Plaintiff reported

mild auditory hallucinations. She denied side effects from her medications. Ms. McClure prescribed an additional medication. *PageID#* 392.

In February 2009, nurse McClure asked plaintiff about a report from a community support worker who, following a home visit, noted that plaintiff's hair was matted, her clothes were dirty and her house smelled of dog waste. Plaintiff reported on-going episodes of depression which occur approximately seven days per month. She also reported increased problems with anxiety, paranoia and irritability. She heard someone calling her name on occasion. Ms. McClure noted that plaintiff's grooming and hygiene were appropriate; her speech was spontaneous and her affect was generally constricted. Plaintiff's eye contact was almost staring in nature; her thoughts were goal-directed. She reported such depressive symptoms as not wanting to get out of bed, lack of interest and social isolation. No medication side effects were noted. Nurse McClure diagnosed bipolar II disorder and increased a medication. *PageID#* 391.

In March 2009, plaintiff reported that she had not been doing well and still had difficulty staying focused. She was increasingly irritable and argumentative at home and paranoid when she went out. She was sleeping fairly well. Plaintiff's speech was spontaneous and mildly pressured, her affect was blunted and her eye contact was almost staring. Nurse McClure diagnosed schizophrenia, paranoid type, and bipolar 1 disorder. *PageID#* 390.

In April 2009, plaintiff reported less stress and depression after being approved for bankruptcy. Plaintiff's grooming and hygiene were appropriate and her speech was spontaneous. Her affect showed a little variability and she was more animated and talkative. Her thoughts were goal-directed. *PageID#* 389.

In June 2009, plaintiff was feeling depressed and stressed. She reported crying spells every couple of days. Although she could not accomplish much around the house, she looked forward to attending church on Sundays. Plaintiff's speech was spontaneous and her affect restricted; her thoughts were relevant and goal-directed and her eye contact was appropriate. Nurse McClure noted no sign of a thought

6

disorder or perceptual disturbance. One of plaintiff's medications was increased. *PageID#* 388.

In July 2009, plaintiff complained that she was not doing well. Focus and attention were difficult; she was irritated and agitated. Plaintiff's speech was spontaneous and her eye contact good. Her affect was restricted and her thoughts were goal-directed. Nurse McClure noted some mild thought blocking and distractability. Plaintiff's medications were changed. *PageID#* 387.

In August 2009, plaintiff reported that she struggled to keep up with the housework and cook a few days per week. She felt good only on Sundays after going to church. Ms. McClure noted that plaintiff's affect was mildly restricted but there was no sign of thought disorder or perceptual disturbances. She increased one of plaintiff's medications. *PageID#* 386.

In September 2009, plaintiff reported that she was out of one of her medications. She had become increasingly afraid, thinking that a rapist was following her. She went nowhere alone and felt that people were watching her or talking about her. She also reported increased irritability. Plaintiff's affect was restricted and her eye contact was staring. According to Nurse McClure, plaintiff was paranoid and delusional. *PageID#* 385.

Later that same month, plaintiff reported continued visual hallucinations, including "witches and warlocks." She even saw them at her church. She also reported auditory hallucinations. Plaintiff still felt that she was followed when she left the house, and it was getting harder to tolerate these problems. Nurse McClure diagnosed bipolar disorder with psychotic features. Plaintiff's medication was changed. *PageID#* 384.

In October and November 2009, plaintiff's medication was increased in light of plaintiff's continued reports of paranoia. *PageID##* 382-83.

Plaintiff continued to report visual hallucinations in December 2009. She remained uncomfortable in public places and around a lot of people. She also reported continued difficulty with motivation and getting things done during the day. *PageID#* 381.

In January 2010, plaintiff complained that her medication was not helping, although Nurse McClure noted that plaintiff was not having any significant visual or auditory hallucinations. Plaintiff continued to report low motivation and feelings of being followed. Plaintiff was reported as brighter and more animated;  she was able to laugh and joke appropriately. Her thoughts were goal-directed. *PageID#* 380.

In February 2010, plaintiff reported feeling "up and down" with increased stress for the prior several months. Her medication was again adjusted. *PageID##* 378-79.

**Women's Tri-County**

Plaintiff was evaluated by Cathy J. Campbell, M.Ed.,LPCC, a licensed counselor, at Women's Tri-County on October 15, 2009. *PageID##* 367-75. Plaintiff reported paranoia, mood swings and sleep problems. *PageID#* 372.  She reported visual hallucinations and depersonalization. Plaintiff's demeanor was mistrustful. Her eye contact was average, her activity level was slowed, and her speech was clear. Her affect was flat. She was diagnosed with schizoaffective disorder bipolar type/depressive type.  Counsellor Campbell assigned a GAF score of 40. *PageID##* 373-74.

In February 1, 2010, plaintiff reported continuing hallucinations despite medication, as well as paranoia. She also reported increased stress due to financial worries. *PageID#* 365.

In March 2010, Plaintiff reported that she no longer experienced thought disturbance related to depression. She was advised to increase her physical activity and to report her weight gain, which plaintiff attributed to her medication, to her doctor.  *PageID##* 362-63.

In May 2010, Counselor Campbell completed a mental residual functional capacity questionnaire in which she indicated that  had a "marked" impairment in the areas of ability to accept instructions or to respond appropriately to criticism from supervisors; to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; to respond appropriately to co-workers or peers; to relate to the general public; to maintain socially appropriate behavior;  to perform and complete work tasks in a normal work day or week at a consistent pace; to process subjective information accurately and to use appropriate judgment; to maintain attention and

concentration for more than brief periods of time; to perform at production levels expected by most employers; to respond appropriately to changes in the work setting; to behave predictably, reliably and in an emotionally stable manner; and to tolerate customary work pressures. Plaintiff had a "moderate" impairment in the areas of ability to work in cooperation with or in proximity to others without being distracted by them; to carry out instructions and complete tasks independently; to remember locations and workday procedures and instructions; to be aware of normal hazards and to take necessary precautions. Plaintiff was unable to respond appropriately to stress. Finally, counselor Campbell concluded that plaintiff's impairment had lasted or was expected to last 12 months or more. *PageID*## 405-08.

**Bureau of Disability Determination Review**

John Waddell, Ph.D., reviewed the file on September 9, 2008 and concluded that plaintiff suffers the severe mental impairments of schizophrenia, paranoid type, bipolar disorder and borderline intellectual functioning. *PageID*## 306-08. However, there was no evidence in the record of episodes of decompensation of extended duration. *PageID*# 314. Accordingly, plaintiff's mental impairments did not meet the "B" or "C" criteria for Listings 12.03 or 12.04. *PageID*## 314-15. Dr. Waddell opined that plaintiff's conditions neither meet nor equal a listed impairment, *PageID*# 304, and that despite her severe mental impairments plaintiff could nevertheless perform simple, routine work in a low stress environment with no more than occasional superficial interaction with others. *PageID*# 320. Dr. Waddell also characterized plaintiff's allegations as credible. *Id*.

**Physical Impairments**

**Consultive Examination**

William D. Padamadan, M.D., performed a consultative evaluation of plaintiff at the request of the state agency on September 25, 2008. *PageID*## 322-28. Plaintiff complained of upper back and neck

pain, which she attributed to a fractured clavicle in 1996. She also reported a heart murmur. Dr. Padamadan found no diastolic or systolic murmurs. Plaintiff was able to jog in place 100 times without any cardiorespiratory or musculoskeletal symptoms. *PageID#* 322. Plaintiff walked without problem; she had good range of motion of the shoulders, elbows, wrists, fingers, hips, knees, ankles, spine and back. Straight leg raising was negative in the supine and sitting positions. Knee and ankle reflexes were intact. Squat test was normal. Plaintiff was able to walk on her heels and toes. Motor strength, sensation and cranial nerves were normal. Plaintiff's hearing, speech, sight and communication skills were normal. She was able to sit, stand and walk and her upper extremity motions of reaching, handling, and fine and gross movements were intact. *PageID#* 323. Dr. Padamadan opined, "Based upon this clinical evaluation and in the absence of objective findings of any functional impairment, I do not see any indication for limitation of physical activities." *PageID#* 324.

**Wheeling Health Right**

On October 9, 2008, plaintiff complained of increased symptoms of gastro-esophageal reflux disease ["GERD"], chronic muscular neck pain and breathing problems. It was noted that plaintiff was a heavy smoker but had no history of asthma. Upon examination, plaintiff's neck was supple, although she favored the right side, and the left side of her neck was strained as a result. Her lungs were clear except for some slight decreased breath sounds bilaterally. Plaintiff was diagnosed with allergic rhinitis and GERD. *PageID##* 360-61.

In December 2008, plaintiff complained of continued neck pain and was concerned that she had throat cancer. Upon examination, plaintiff's lungs were clear. She had some left-sided trapezius muscle tightness with no spasm or masses noted. Plaintiff was diagnosed with muscle spasms in the neck and prescribed Flexeril. *PageID##* 358-59.

Plaintiff reported continued neck pain in February 2009. Flexeril had only taken the edge off the pain. On clinical examination, plaintiff had normal strength throughout; tone and reflexes were also normal. There was tenderness to palpation of the left side of the neck and the trapezius muscle. Plaintiff was diagnosed with

10

hyperlipidemia/dyslipidemia and neck pain. Her neck pain was thought to be musculoskeletal in nature given her grossly normal exam and lack of neurological symptoms. She was instructed to try Tylenol, Advil or heating pads for her symptoms. *PageID## 355-57.*

In May 2009 plaintiff, accompanied by her mother, was adamant that a source be found for plaintiff's neck pain. She denied range of motion problems, visual disturbances, frank headache or migraine, but did report some chronic thoracic back pain. On clinical examination, plaintiff's neck was supple with no muscle spasm noted; there was full range of motion. Plaintiff's pain could not be reproduced. Plaintiff was diagnosed with neck pain, back pain, hyperlipidemia and dyslipidemia. The doctor saw "no reason for this vague neck pain that is apparently quite debilitating. Perhaps she has an old injury." *PageID## 353-54.* The physician discontinued plaintiff's prescribed Flexeril because plaintiff "stated it doesn't help her neck pain." *PageID# 354.* He also discontinued Nexium for complaints of heartburn because plaintiff's complaints of abdominal pain, bloating and severe heart burn after eating had continued. "She tells me she belches after eating and this is bothersome to her." *PageID# 353.* A different medication was prescribed because plaintiff stated that she "cannot deal with the heartburn." *PageID# 354.*

X-rays of the cervical spine were normal; x-rays of the thoracic spine revealed mild dextroscoliosis of the curvature. *PageID# 352.* A request for an MRI was determined, in light of plaintiff's normal musculoskeletal exam, not to be medically necessary. *PageID## 350-51.*

**Bureau of Disability Determination Review**

In January 2009, Willa Caldwell, M.D. a state agency physician, reviewed the medical record and indicated that plaintiff does not have a "severe" physical impairment. *PageID# 348.*

**III.**

**Administrative Decision**

11

In his decision, the administrative law judge found that plaintiff's severe impairments consist of bipolar disorder and schizophrenia, paranoid type, with alleged hallucinations. *PageID#* 97. The administrative law judge found no severe physical impairment.

The administrative law judge also found that plaintiff does not suffer an impairment or combination of impairments that meets or medically equals any listed impairment. *Id.* The administrative law judge specifically considered, but rejected, any suggestion that plaintiff is disabled under Listings 12.03 (schizophrenic, paranoid and other psychotic disorders), 12.04 (affective disorder) or 12.05C (mental retardation). With respect to Listings 12.03 and 12.04, the administrative law judge found that plaintiff's impairments met neither the "B" nor the "C" criteria of the Listings. *PageID##* 98-99. In considering Listing 12.05C, the administrative law judge acknowledged that testing reflected qualifying I.Q. scores but found that the record did not establish the remaining criteria of the Listing:

> While this IQ testing was considered to be valid, the undersigned notes that the evidence does not support a finding that the claimant had significantly subaverage general[] intellectual functioning with deficits in adaptive functioning initially manifested prior to the age of 22.

*PageID#* 99.

The administrative law judge went on to find that plaintiff retains the residual functional capacity to

> perform a full range of work at all exertional levels but with the following non-exertional limitations: that she should work in a low stress environment with no production line or assembly line type of pace and no independent decision making responsibilities. She is limited to performing unskilled work involving only routine and repetitive instructions and tasks. She should have no interaction with the general public and minimal, no more than occasional, interaction with co-workers and supervisors.

*Id.* In finding that plaintiff does not suffer a severe physical impairment, the administrative law judge relied on the consultative physical evaluation of Dr. Padamadan and on the records of Wheeling Health Right. As they relate to plaintiff's mental impairments, the

12

administrative law judge's findings were based on the psychological evaluation of Karen Campbell and the treatment records of North Point and Women's Tri-County. *PageID#* 111. The administrative law judge declined to give "significant weight" to Cathy Campbell's extremely restrictive mental residual functional capacity assessment "because, with a Master of Arts degree, she is not an acceptable medical source pursuant to 20 CFR 404.1513, but her statements and opinions have been considered in accordance with the regulations." *PageID#* 109. The administrative law judge also considered plaintiff's subjective complaints but found that those complaints were "not credible to the extent they are inconsistent with" this residual functional capacity. *Id*. In light of this credibility determination, the administrative law judge rejected Dr. Waddell's opinion that plaintiff's allegations were credible, although the administrative law judge adopted Waddell's assessment of plaintiff's residual functional capacity. *PageID#* 111.

Relying on the vocational expert's testimony, the administrative law judge found that this residual functional capacity would permit plaintiff to perform her past relevant work as a janitor. *PageID#* 111. Accordingly, the administrative law judge concluded that plaintiff is not disabled within the meaning of the Social Security Act. *PageID#* 112.

**IV.**

**DISCUSSION**

Pursuant to 42 U.S.C. §405(g), judicial review of the Commissioner's decision is limited to determining whether the findings of the administrative law judge are supported by substantial evidence and employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389 (1971). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001); *Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility. *See Brainard v. Secretary of Health & Human*

*Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole. *Kirk*, 667 F.2d at 536. If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if this Court would decide the matter differently, *see Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Longworth v. Comm'r Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).

In her *Statement of Errors*, plaintiff contends that the administrative law judge erred in his credibility assessment of plaintiff, violated the treating physician rule by wrongly assessing Cathy Campbell's credentials and violating SSR 06-03P regarding Nurse McClure's assessment, erroneously rejected the Dr. Waddell's credibility assessment, erred at Step 3 of his sequential evaluation by not finding that plaintiff satisfied the criteria for schizoaffective disorder as set forth in Listing 12.03 and mental retardation as set forth in Listing 12.05C, and erred at Step 2 of the sequential evaluation by failing to find that plaintiff's GERD is a severe physical impairment. The Court will consider plaintiff's contentions – not in the order presented by plaintiff – but as those contentions are relevant to the sequential evaluation of disability.

**GERD as a Severe Physical Impairment**

Plaintiff argues that the administrative law judge erred in failing to include GERD among plaintiff's severe impairments. In finding that plaintiff has no severe physical impairment, the administrative law judge relied on the report of the consultative examiner, who found no "indication for limitation of physical activities," *PageID#* 324, and on plaintiff's treatment records at Wheeling Health Right. *PageID#* 111. Although those treatment records include some reference to GERD, *PageID##* 353-54, the record contains no evidence that the condition imposes any work-related limitation of function. The administrative law judge's finding in this regard is therefore supported by substantial evidence.

**The Listings of Impairments**

The administrative law judge also found that none of plaintiff's impairments, whether considered singly or in combination, either meet or equal a listed impairment. In this regard, the administrative law judge considered Listings 12.03, 12.04 and 12.05C. With respect to the first two Listings, the administrative law judge found that plaintiff's mental impairments failed to satisfy the "B" and "C" criteria of the Listings and, specifically, that plaintiff had experienced no repeated episodes of decompensation which have been of extended duration, as required by the Listings. Plaintiff argues that the administrative law judge erred in finding that plaintiff had not established evidence of "[r]epeated episodes of decompensation, each of extended duration" as required by the "B" and "C" criteria of Listings 12.03 and 12.04. Plaintiff specifically argues that such decompensation is evidenced by the repeated changes in plaintiff's medications, as reflected in plaintiff's North Point treatment records.

The Commissioner's regulations define "episodes of decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." Listing 12.00C4. The regulation goes on to provide, *inter alia*, that "[e]pisodes of decompensation may be inferred from medical records showing significant alteration in medication . . . ." *Id*. In finding that plaintiff had not established evidence of repeated episodes of decompensation, the administrative law judge stated only that "claimant has not been psychiatrically hospitalized since her alleged onset date, and she has not experienced any loss of adaptive functioning." *PageID#* 98. The administrative law judge made no mention of the changes in plaintiff's medications by North Point personnel.

This Court concludes that the matter must be remanded for further consideration of whether plaintiff's mental impairments meet or equal Listing 12.03 or 12.04. It is not sufficient that Dr. Waddell, the state agency psychologist, opined that plaintiff's impairments neither met nor equaled a listed impairment. Dr. Waddell conducted his review of the record in September 2008 – *i.e.*, only a few months after plaintiff began her treatment at North Point. Dr. Waddell's review lacked the

15

benefit of almost two more years of treatment and counseling at North Point and Women's Tri-County.[2]

The Court also concludes, however, that there is substantial support in the record for the finding that plaintiff's diagnosed borderline intellectual functioning does not satisfy Listing 12.05C. The administrative law judge found that the record contained no evidence of significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested prior to the age of 22. *PageID##* 98-99. Plaintiff appears to argue that plaintiff's subaverage IQ scores and reported panic attacks dating to the age of 17, *see PageID#* 127, are sufficient to satisfy this Listing. Under the Social Security regulations, "loss of adaptive functioning" is "manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R., Pt. 404, Subpt. P., App. 1, §12.00C4. *See also West v. Comm'r Social Sec. Admin.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007)("Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills"). Present IQ scores do not alone establish that a claimant suffered subaverage intellectual functioning or deficits in adaptive functioning during the developmental period. "A claimant must produce evidence beyond his present IQ scores to show that he exhibited deficits during his developmental period." *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491-92 (6th Cir. 2010), citing *Foster*, 279 F.3d at 354-55. Moreover, the mere fact that plaintiff may have suffered panic attacks during the developmental period is not of itself evidence of deficits in adaptive functioning. The administrative law judge did not err in concluding that plaintiff's cognitive functioning neither met nor equaled Listing 12.05C.

**The "Treating Physician Rule"**

Opinions of treating physicians must be accorded controlling weight if they are "well-supported by medically acceptable clinical and

---

[2]As plaintiff notes, the administrative law judge failed to include borderline intellectual functioning among plaintiff's severe mental impairments, although Karen Campbell (and Dr. Cerra), and Dr. Waddell diagnosed that condition. However, plaintiff does not suggest how that condition was not accommodated by the residual functional capacity found by the administrative law judge.

laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §404.1527(d)(2). Plaintiff argues that the assessment of plaintiff's mental residual functional capacity articulated by her counselor, Cathy Campbell, was entitled to such deference. The administrative law judge accorded little weight to that assessment because Ms. Campbell "is not an acceptable medical source. . . ." *PageID#* 109. This Court agrees.

The sources who can provide evidence sufficient to establish an impairment are, *inter alios*, licensed or certified psychologists. 20 C.F.R. § 404.1513(a)(2). Plaintiff concedes that Cathy Campbell "may not be a licensed psychologist." *Statement of Errors*, p. 17. *See also* O.R.C. § 4732.01(F)(a "licensed psychologist" is an "individual holding a current, valid, license to practice psychology issued under Section 4732.12 or 4732.15 of the Revised Code").[3] She is therefore not a medical source whose opinion was entitled to the deference to be accorded to that of a treating physician.[4]

However, evidence from other sources, such as therapists, may be considered to establish the severity of an impairment and how it affects a claimant's ability to work. 20 C.F.R. § 404.1513(d)(1). Among the factors to be considered in evaluating the opinions of "other sources" are the length of time and frequency of treatment, consistency with other evidence, the degree to which the source presents relevant evidence to support the opinion, how well the opinion is explained, whether the source has a special expertise and any other factor supporting or refuting the opinion. SSR 06-03p, 2006 WL 2329939, *4-5. "[T]he adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or

---

[3]Plaintiff refers to another decision of this Court, *Arnold v. Astrue*, 2010 WL 5812957 (S.D. Ohio October 7, 2010), in which a mental health professional with the same academic degree as Cathy Campbell, *i.e.*, M.Ed., was treated as a medical source. However, an individual's degree is not determinative of whether the individual is a licensed psychologist. As noted, plaintiff concedes that Cathy Campbell is not.

[4]The fact that the administrative law judge erroneously referred to Cathy Campbell's degree as a "Master of Arts degree," *PageID#* 109, is immaterial.

subsequent reviewer to follow the adjudicator's reasoning. . . ." *Id.* at *6.

In the case presently before the Court, the administrative law judge discounted Cathy Campbell's assessment simply because she is not a medical source.  He failed entirely to evaluate her opinion by reference to the other factors specified in SSR 06-03p; moreover, the administrative law judge wholly failed to explain the weight given to her opinion, as required by the Commissioner's Rule.  Under these circumstances, too, the matter must be remanded for further consideration.

**Administrative Law Judge's Credibility Determination**

The administrative law judge found that plaintiff's subjective statements concerning her symptoms and limitations were not entirely credible.  *PageID#* 111.  Plaintiff disagrees with that finding.

An administrative law judge is not required to accept a claimant's subjective complaints, but may instead properly consider the credibility of a claimant. *See Walters v. Commissioner of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  Because the administrative law judge has the opportunity to observe a witness' demeanor while testifying, his credibility determinations are accorded great weight and deference. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001). However, credibility determinations must be clearly explained.  *Auer v. Secretary of Health and Human Servs.,* 830 F.2d 594, 595 (6th Cir. 1987).  If the administrative law judge's credibility determinations are explained and enjoy substantial support in the record, the Court is without authority to revisit those determinations.  *See Beavers v. Secretary of Health, Educ. and Welfare,* 577 F.2d 383, 386-87 (6th Cir. 1978).  *See also Felisky v. Bowen,* 35 F.3d 1027 (6th Cir. 1994).

In the case presently before the Court, the administrative law judge gave extensive consideration to the issue of plaintiff's credibility.  *PageID##* 109-112. The Court cannot say that his findings in that regard are not clearly articulated or lack substantial support in the record.  However, because those findings were based, at least in part, on the administrative law judge's evaluations of the assessments of Dr. Waddell and plaintiff's treating counselors, which this Court has

18

concluded were deficient, the Court concludes that, on remand, the issue of plaintiff's credibility should also be reassessed.

It is therefore **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that this action be **REMANDED** to the Commissioner of Social Security for further proceedings.

If any party seeks review by the District Judge of this *Report and Recommendation,* that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation,* specifically designating this *Report and Recommendation,* and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1); F.R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy thereof. F.R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *Smith v. Detroit Federation of Teachers, Local 231 etc.,* 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

*s/Norah McCann King*
Norah McCann King
United States Magistrate Judge

July 10, 2012